UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| First American Title Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>Commerce Associates, LLC et al,<br><br>Defendants. | Case No. 2:15-cv-00832-RFB-VCF<br><br>**ORDER** |

### I.  INTRODUCTION

Before the Court is Plaintiff's renewed Motion for Partial Summary Judgment (ECF No. 90).

### II.  PROCEDURAL BACKGROUND

On May 4, 2015, Plaintiff filed the current suit against Commerce Associates, LLC; TG Investments, LLC; and Does 1 through 10. EFC No. 1.

On August 26, 2015, Defendants filed a Motion to Dismiss, for failure to state a claim. EFC No. 27. On February 18, 2016, the Court granted in part and denied in part the Motion to Dismiss; the Court allowed all causes of action to proceed with the exception of the unjust enrichment claim, which was dismissed without prejudice. ECF No. 50.

Plaintiff filed a First Amended Complaint on May 5, 2016. ECF No. 56. A scheduling order issued on May 20, 2016. ECF No. 63. The discovery cut-off date was set for October 11, 2016.

Plaintiff filed a Second Amended Complaint on August 15, 2016. ECF No. 72.

Plaintiff filed the instant Motion for Partial Summary Judgment on November 9, 2016, seeking summary judgment on Plaintiff's third and fourth counts, unjust enrichment and breach of

contract, respectively. ECF No. 90. Defendants filed a Response on December 9, 2016, and Plaintiff replied on December 23, 2016. ECF Nos. 93, 96. A hearing on the motion was held on August 28, 2017 at which the Court deferred ruling on the motion. ECF No. 104. The Court denied the motion without prejudice on September 29, 2017, permitting Plaintiff to re-file after trial. ECF No. 105.

The parties filed a joint proposed pretrial order on November 17, 2017 (ECF No. 108) and trial was subsequently scheduled and postponed several times. In preparation for trial, the parties filed motions in limine. ECF Nos. 121, 131, 132, 139. Further, on July 1, 2019, Plaintiff filed a Motion for Leave to File a Renewed Motion for Partial Summary Judgment, seeking to renew its Motion for Summary Judgment and representing that if granted leave and if its motion for summary judgment were granted, it would voluntarily dismiss its remaining claims against Defendants. ECF No. 144 at 3-4.

The Court held a pretrial conference on February 18, 2020, to discuss the Motions in Limine as well as Plaintiff's Motion for Leave to File a Renewed Motion for Partial Summary Judgment, vacated the trial set for February 24, 2020, and took the motion to renew under submission. ECF No. 155. At the hearing, the Court denied Plaintiff's claim, pertinent to the instant motion, as to fraudulent transfer. ECF No. 157 at 5-7. On March 3, 2020, the Court denied the Motions in Limine without prejudice and granted in part the Motion for Leave to File a Renewed Motion for Partial Summary Judgment. ECF No. 156. The Court permitted the parties to each file a supplement to the briefing on the original Motion for Partial Summary Judgment (ECF No. 90) and set a pretrial conference for April 15, 2020. Id. The Court stated that it would not consider subsequent arguments that could have been brought in the initial briefing. ECF No. 157 at 77-78.

Both parties filed supplemental briefs on March 10, 2019. ECF Nos. 159, 160. On April 7, 2020, the Court vacated the pretrial conference and jury trial in light of the global pandemic and set a status conference for June 2020. ECF No. 161. The status conference was again vacated and scheduled for July 14, 2020. ECF No. 163.

. . .

. . .

### III. FACTUAL BACKGROUND

The following facts are undisputed:

### a. Undisputed Facts

In 2004, Commerce was the master developer of a mixed use planned community in Henderson, Nevada known as "Tuscany." ECF No. 90-1 at 2 (citing ECF No. 76, ¶ 9; ECF No. 82, ¶ 9). In December 2004, Commerce entered into a written agreement with the City of Henderson (the "City") which required Commerce to complete the third phase of a water drainage facility commonly known as the "C-1 Channel" which carried storm water runoff from Tuscany and other properties (the "C-1 Channel Phase 3 Agreement"). Id. (citing ECF No. 72-1, ¶ B; ECF No. 76, ¶¶ 9-10; ECF No. 82, ¶¶ 9-10) (noting ECF No. 72-1 is the C-1 Channel Phase 3 Agreement). The C-1 Channel Phase 3 Agreement also required Commerce to pay the City the sum of $934,000 (the "C-1 Impact Fee"). Id. (citing ECF No. 72-1, ¶¶ 3.1, 3.3; ECF No. 76, ¶ 10; ECF No. 82, ¶ 10).

Article III of the Agreement, laying out the obligation to the City, reads as follows:

> 3.1 <u>Commerce Phase 3 Monetary Obligations</u>: The Parties acknowledge that they have discussed the impact, attributable to Tuscany, that water drainage from the C-1 Channel will have on the Las Vegas Wash. Based on those discussions and having due regard for the impact of Tuscany drainage on the Las Vegas Wash as well as the overall health, safety and management of the Las Vegas Wash, the Parties have agreed that the sum of $934,000 (the "<u>C-1 Impact Fee</u>") is an appropriate contribution to be made by Commerce, on behalf of Tuscany, to the City for Las Vegas Wash improvements related to the effect, at the C-1 Channel "Confluence" or "Convergence", of Tuscany's use of the C-1 Channel and its impact on the Las Vegas Wash.
>
> 3.2 <u>Interlocal Agreement</u>. The City represents that it has discussed, with SNWA [Southern Nevada Water Authority], the impact of the C-1 Channel on the Las Vegas Wash and the amounts to be contributed by Commerce on behalf of Tuscany, and that SNWA and the City have approved the amount of the C-1 Impact Fee. Promptly following the approval of this Agreement, the City agrees to enter into an Interlocal Agreement with SNWA for the purpose of approving the provisions of this Agreement insofar as they affect the Las Vegas Wash in order to establish any and all construction, financial or other obligations of Commerce and any other owners within Tuscany with respect to the Las Vegas Wash, including improvements or costs related thereto at the C-1 Channel "Confluence" or

> "Convergence".
>
> 3.3 <u>Payment of the C-1 Impact Fee</u>. Commerce shall pay the C-1 Impact Fee to the City, or as the City may direct in accordance with the Interlocal Agreement, in two installments of $467,000. The first installment shall be due and payable on May 31, 2005 and the final installment shall be due and payable on November 30, 2005.
>
> 3.4 <u>Limitation</u>. The Commerce Phase 3 Obligations shall be limited to the obligations set forth in Section 2.2 and 3.3. Without limiting the foregoing, other than the payment of the C-1 Impact Fee, neither Commerce nor any other property owner within Tuscany shall be obligated to make or pay for any improvement to the Las Vegas Wash or to make or pay any amount on account of the development of Tuscany in accordance with the Tuscany Land Use approval.

ECF No. 90-10 at 6-7. Article II stated in pertinent part:

> 2.2. <u>Construction of Phase 3</u>. Following the approval of the Phase 3 Plans by the City of Henderson and payment by Commerce of fees and placement of bonds, as described in Paragraph 2.3 below for Phase 3, Commerce shall cause Phase 3 to be constructed in a good and workmanlike condition, lien free and in accordance with the approved Phase 3 Plans. Commerce shall use commercially reasonable efforts to construct Phase 3 in a prompt time period. For purposes of clarification, the construction obligations of Commerce with respect to Phase 3 do not proceed beyond the "sheet piling" at the end of the cut off wall, as set forth on the Phase 3 Plans, it being the intention of the Parties that the Commerce Phase 3 Obligations with respect to construction not include any work or improvements to or within the Las Vegas Wash itself.

<u>Id.</u> at 6.  Commerce did not pay this C-1 Impact Fee. ECF No. 90-1 at 2 (citing Jankowiak Dep. 14:17-15:7; Fullmer Dep. 28:25-29:9; Commerce Response to Interrogatory No. 7).

In December 2012, Commerce sold a portion of the Tuscany project to non-party Greystone Nevada, LLC ("Greystone") pursuant to the terms of a written purchase and sale agreement (the "Purchase Agreement"). <u>Id.</u> at 3 (citing ECF No. 72-5; ECF No. 76, ¶¶ 12, 37; ECF No. 82, ¶¶ 12, 37; Dep. Ex. 1) (footnote omitted). Commerce did not disclose to Greystone that it had failed to pay the C-1 Impact Fee. <u>Id.</u> (citing Bennett Dep. 170:9-22; Parness Dep. 156:7-157:11).

. . .

The "Close of Escrow" occurred on December 21, 2012. Id. (citing Bennett Dep. 43:22-24; Rice Dep. 119:12-14).

In relevant parts, the Purchase Agreement provides as follows:

6.01 Preliminary Title Report.

(a) Seller, at its sole expense, and within three (3) Business Days after the Effective Date, shall cause Escrow Holder to deliver to Buyer a preliminary title report for the Property, contemplating an ALTA Extended Coverage Owner's Policy of title insurance, with a survey exception, together with a legible copy of listed title exceptions in connection with the preliminary title report (collectively, the "Title Report"). Upon Buyer's approval of its Feasibility Review Buyer shall be deemed to have approved those covenants, conditions, restrictions, rights of way, easements, reservations and other matters of record, as disclosed in the Title Report (the "Permitted Title Exceptions "); provided, however, that the Permitted Title Exceptions shall not include, and Seller shall remove at its sole expense, at or before the Close of Escrow, and shall cause the Property to be delivered and conveyed free and clear of, any and all: deeds of trusts, mortgages, mechanics' liens, notices of lis pendens, and /or other monetary liens (except only for non -delinquent taxes and assessments) whatsoever. Additionally, the Permitted Title Exceptions shall not include the matters addressed in Schedule B, Section 1 to the Title Report labeled "requirements ", and Seller shall be required to satisfy all such requirements on or before the Close of Escrow at its sole expense (to the extent reasonably applicable to Seller and not otherwise inconsistent with this Agreement), except that Seller shall not be required to obtain or provide an ALTA survey for the Property (and neither shall Buyer) or to satisfy any "requirements" that are obligations of Buyer according to the terms of this Agreement.

7.01 Conditions for the Benefit of the Buyer. Buyer's obligation to acquire the Property and to perform other obligations associated with the Close of Escrow shall be conditional and contingent upon the satisfaction, or waiver by Buyer, as and when required below, of each of the following conditions (collectively, the "Buyer Conditions"):

(a) Initial Feasibility Review.

(i) On or before 5:009 P.M. Nevada time on the date that is thirty (30) days after the Effective Date (the period until such date and time, the "Initial Feasibility Period"), Buyer shall have the right to review and approve the feasibility of Buyer's acquisition of the Property based on Buyer's inspection, review and analysis of the Property and Property Documents, including, without limitation, the following . . . (iv) any existing agreements or title matters related to the Property . . . and (vi) any

5

other matters related to or affecting the Property desired to be reviewed and approved by Buyer[.]

(ii) If Buyer approves of the Initial Feasibility Review, Buyer shall provide written notice of such approval to Seller on or before the expiration of the Feasibility Period. In the event Buyer fails to approve the feasibility of Buyer's acquisition of the Property by written notice to Seller on or before the expiration of the Initial Feasibility Period, Buyer shall be deemed to have disapproved the initial Feasibility Review, in which event this Agreement shall automatically terminate, the Deposit shall be returned to Buyer, and neither Party shall have any further rights, duties or obligations under this Agreement, except those that by their express terms survive the termination of this Agreement. In the event Buyer delivers written notice of approval to Seller on or before the expiration of the Initial Feasibility Period, this Buyer Condition dealing with the Initial Feasibility Period shall be deemed satisfied.

(b) <u>Representations and Warranties</u>. As of the pertinent Close of Escrow, the representations and warranties of Seller set forth in this Agreement, including without limitation those set forth in <u>Article IX</u> below, shall be true and correct.

. . .

(d) <u>Title Insurance</u>. Escrow Holder shall be committed to issue to Buyer a CLTA Standard Owner's Policy of Title Insurance, with liability limits equal to the Purchase Price, insuring fee title to the Property as being vested in Buyer, subject only to the Permitted Title Exceptions (the "Title Policy"). Notwithstanding the foregoing, Buyer shall have the right to obtain an ALTA Extended Coverage Owner's Policy of Title Insurance in lieu of the CLTA Standard Owner's Policy of Title Insurance, or any required title endorsement, provided Buyer shall pay all excess costs in connection therewith and the costs of obtaining any necessary survey.

. . .

8.09 <u>Costs and Prorations</u>. The following shall apply: . . . (b) <u>Property Taxes and Assessments</u>. All non-delinquent general and special real property taxes, bonds and assessments, SID's LID's [Special/Local Improvement Districts – obligations of developer to pay for city installation of infrastructure, e.g. plumbing] (each as applicable) with respect to the Property, including, without limitation, any and all assessments with respect to any applicable association, landscape maintenance districts or assessment districts, shall be paid current at Closing by Seller and prorated through Escrow between Buyer and Seller as of the pertinent Close of Escrow based upon the latest available tax bills using customary escrow procedures. Further, if the regular tax bill or bills for the Property for the fiscal year in which the Escrow closes are not available as of the Close of Escrow, Buyer and Seller shall re-prorate all such general and special real property taxes, bonds and assessments for the Property between themselves outside of Escrow based upon the

> then current fiscal year's regular tax bill or bills within (30) days following the date such regular tax bill or bills are actually received by the parties. This Section shall be interpreted broadly toward the end that any taxes, assessments, bond obligations, or other payment obligations accruing prior to Close of Escrow shall be the responsibility of Seller and any taxes, assessments, bond obligations, or other payment obligations accruing after the Close of Escrow shall be the responsibility of the Buyer. The provisions set forth in this <u>Section 8.09</u> shall survive Close of Escrow for all purposes.
>
> . . .
>
> 16.08 <u>Entire Agreement</u>. This Agreement and its exhibits constitute the final and complete expression of agreement between the Parties hereto pertaining to the subject matter hereof. All prior agreements, representations, negotiations and understandings of the parties hereto, oral or written, express or implied, are hereby superseded and merged herein.
>
> . . .
>
> 16.13 <u>Amendments</u>. No addition to or modification of any provision contained in this Agreement shall be effective unless fully set forth in writing executed by both Buyer and Seller.

ECF No. 90-8 at 5-20.

Greystone received an ALTA Extended Coverage Owner's Policy of Title Insurance from Plaintiff. ECF No. 90-1 at 5 (citing ECF No. 72-2).

In 2013, the City notified Greystone (the new owner of Tuscany) that it would not issue Greystone any additional building permits for the Tuscany project unless and until someone paid the C-1 Impact Fee. Id. at 4 (citing Bennett Dep. 44:17-21; Jankowiak Dep. 44:7-19; Dep. Ex. 45, ¶ 1). Greystone made a demand to Commerce that Commerce honor its obligation arising under section 8.09(b) of the Purchase Agreement by immediately paying the C-1 Impact Fee. Id. (citing ECF No. 72-3; ECF No. 76, ¶ 14; ECF No. 82, ¶ 14). Commerce did not respond. Id. (citing ECF No. 76, ¶ 14; ECF No. 82, ¶ 14.)

Greystone tendered a claim to its title insurer, First American, claiming that any loss associated with the C-1 Impact Fee was covered by the policy of title insurance issued by First American to Greystone (the "Policy"). Id. (citing ECF No. 72-2; ECF No. 76, ¶

13; ECF No. 82, ¶ 13; Bennett Dep. 54:2-23; Dep. Ex. 17.) The City demanded Greystone pay the full, $934,000 C-1 Impact Fee. Id. (citing Bennett Dep. 44:22-24; Parness Dep. 157:16-19). The parties ultimately made an agreement whereby the City would accept $300,000 in full satisfaction of any obligation that Greystone might have to pay the C-1 Impact Fee. Id. (citing ECF No. 72-4; ECF No. 76, ¶ 15; ECF No. 82, ¶ 15; Bennett Dep. 165:2-13; Fullmer Dep. 23:20-24:20; Parness Dep. 157:20-158:20). First American accepted Greystone's title insurance claim, and ultimately paid the sum of $300,000 to fully resolve and settle the matter with the City. Id. at 4-5 (citing Bennett Dep. 54:21-23, 72:1-17, 91:3-13; Fullmer Dep. 23:20-24:20; Dep. Ex. 33) (noting Deposition Exhibit 33 is the City's receipt for $300,000 tendered by First American).

Condition 13 of the Policy recites as follows:

> 13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT
> (a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.
> If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.
> (b) the Company's right of subrogation includes the right of the Insured to indemnities, guarantees, other policies or insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

Id. at 5 (citing ECF No. 72-2 at 4-5).

Defendant Gonzales is presently the sole member of Commerce. ECF No. 90-1 (citing ECF No. 76, ¶ 4; ECF No. 82, ¶ 4). Commerce's sole business was the development of the Tuscany project. Id. at 5-6. (citing Gonzales Dep. 23:6-14, 25:7-16; 125:9-13). After Commerce sold its stake in Tuscany to Greystone, Commerce distributed its remaining

assets. Id. at 6 (citing ECF No. 76, ¶ 19; ECF No. 82, ¶ 19). Commerce instructed First American to wire the $9,248,734.07 it was to receive from Greystone through the close of escrow to its attorney's trust account. Id. Commerce's counsel retained $30,734.07 for legal fees. Id.

On December 24, 2012, Commerce's counsel then distributed $5,500,000 of the sales proceeds to a Florida-based escrow company, Capstone Title Partners. Id. The purpose of this wire was to fund a settlement between Gonzales and a lender to exonerate Gonzales from a $5.5 million personal guaranty of a loan which was unrelated to Commerce. Id. at 6 (citing Gonzales Dep. 133:22-134:8, 136:12-138:7; Dep. Ex. 68) (noting Dep. Ex. 68 is a settlement agreement and release between Gonzales and the lender which made the loan guaranteed by Gonzales).

On January 22, 2013, Commerce's counsel distributed $1,725,000 of the sales proceeds to Bridge Financial, LLC. Id. (citing ECF No. 76, ¶ 19; ECF No. 82, ¶ 19).

On February 8, 2013, Commerce's counsel wired $1,893,000 of the sales proceeds to Woods & Associates Yacht Brokerage, Inc. Id. The wire to Woods & Associates Yacht Brokerage, Inc. was not made by Commerce. Id. at 6 (citing Gonzales Dep. 122:7-123:5).

On March 11, 2013, Commerce's counsel wired the last $100,000 of its assets to a Merrill Lynch account owned and controlled by Defendant TG Investments, LLC. Id. (citing ECF No. 76, ¶ 19; ECF No. 82, ¶ 19).

On January 9, 2013, the City contacted Commerce to inquire regarding the status of the C-1 Impact Fee, as it could not find any evidence that the C-1 Impact Fee had been paid. Id. (citing Jankowiak Dep. 31:8-12; Dep. Ex. 42). Commerce did not respond to the City's inquiry. Id. (citing Jankowiak Dep. 34:22-35:14; Dep. Ex. 43.) Commerce presently has less than $934,000 in assets Id. (citing Commerce Response to Request for Admission No. 5).

### IV. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

### V.     DISCUSSION

Plaintiff moves for summary judgment on its breach of contract claim, and in the alternative on a claim of unjust enrichment. While in the initial briefing the parties argued the issue as to whether Plaintiff as insurer was the subrogee of the insured Greystone's rights under the Purchase Agreement, at the hearing in February, Defendants stated they were "not arguing there's no subrogation." ECF No. 157 at 80. Therefore, in deciding the instant motion and for the duration of this action, the Court considers Defendants' prior argument withdrawn and assumes Plaintiff has subrogated to non-party Greystone's rights against Commerce. Further, the Court reiterates its ruling from the bench at the February hearing that Plaintiff has failed to adequately plead a claim for fraudulent transfer and therefore does not consider that argument as made in the original briefing. Therefore, the instant discussion considers Plaintiff's breach of contract and unjust enrichment claims, as well as Plaintiff's claim that Defendants Gonzales and TG Investments, LLC are joint and severally liable for Commerce's alleged debts pursuant to a theory of alter ego liability.

### A. Breach of Contract

Beginning with the breach of contract claim, Plaintiff asserts that Commerce violated the terms of the Purchase Agreement by refusing to pay the C-1 Impact Fee, which was a debt arising before the Close of Escrow. Defendants' opposition focuses on the negotiations of the title commitment insurance policy between Plaintiff and Greystone, and the Purchase Agreement between Greystone and Defendant Commerce. Specifically, Defendants discuss testimony illustrating that First American initially refused to remove Exception 37, an exception for the C-1 Impact Fee, but ultimately did so right before finalizing the insurance agreement because it believed that the obligation was no longer valid/operative. Defendants also discuss testimony showing a dispute as to whether Greystone requested, and Defendant Commerce refused, to indemnify Greystone for any losses associated with Exception 37.  Plaintiff does not dispute this testimony but argues it is irrelevant to its breach of contract claim under a contract with a whole agreement/integration clause, where the plain language obligates Commerce for a kind of debt that would include the C-1 Agreement.

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005) (citation omitted).  Breach of contract is "a material failure of performance of a duty arising under or imposed by agreement."  Bernard v. Rockhill Dev. Co., 734 P.2d 1238, 1240 (Nev. 1987) (citation omitted) .  A breach of contract claim under Nevada law requires (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013) (quoting Saini v. Int'l Game Tech., 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing Richardson v. Jones, 1 Nev. 405, 409 (1865)). Where "a written contract is clear and unambiguous on its face, extraneous evidence cannot be introduced to explain its meaning. Extrinsic or parol evidence is not admissible to contradict or vary the terms of an unambiguous written instrument, since all prior negotiations and agreements are deemed to have been merged therein." Klabacka v. Nelson, 394 P.3d 940, 949 (Nev. 2017) (internal citations and quotation marks omitted).

1          Plaintiff argues that the plain language of section 8.09(b) of the Purchase Agreement, making any "payment obligations" accruing prior to the Close of Escrow the "responsibility of [Commerce]," which were to be "paid current at Closing by [Commerce]," meant that Commerce was obliged to pay the C-1 Impact Fee, of which the City of Henderson demanded payment prior to granting additional construction permits to Greystone. Pursuant to the C-1 agreement, payment was due in two installments in 2005. Therefore, the agreement was breached at closing of the sale of Tuscany from Commerce to Greystone and remained breached when the City withheld the permits pending payment, and Commerce ignored Greystone's demand to pay the fee.

          Defendants make several arguments in opposition. In the original briefing, Defendants argued that the C-1 Impact Fee does not fall within the scope of section 8.09(b), as "impact fees" are nowhere mentioned in the section, and that "other payment obligations" should not be construed to include the fee. Defendants contest the relevance of the testimony of Stephen Rice (Defendant Commerce's counsel for the Purchase Agreement), admitting that Commerce was obligated to pay the C-1 Impact Fee through an agreement made prior to the sale, reciting testimony in which he argues that section 8.09 is titled, "Costs and Prorations," and 8.09(b) is titled "Taxes and Assessments," and that an "impact fee" owed to the City would not fall within these categories. Moreover, because of the request and refusal regarding the indemnity mentioned *supra*, Defendant Commerce did not intend to obligate itself to pay the Impact Fee.

          The Court finds that any obligation to pay the C-1 impact fee—arguments as to Defendants' assertion that the non-existence or expiration of the obligation will be addressed *infra*—falls squarely within the plain language of section 8.09(b). In light of the plain language of the section which defines its terms in detail, the section titles cannot be used to argue that the C-1 Impact Fee falls outside the provision's scope. Indeed, the section includes language cautioning against such an interpretive approach; it states that the section "shall be interpreted broadly toward the end that any taxes, assessments, bond obligations, or other payment obligations accruing prior to the Close of Escrow," are the responsibility of the buyer to be paid prior to closing. ECF No. 90-8 at 11. The unambiguous intent is to require that any debts owed and attached to the property that accrued prior to the sale, were to be paid by Commerce. Moreover, the section explicitly

references SIDs and LIDs, analogous obligations whereby a developer is obligated to pay for infrastructure improvements made by the city. In light of the lack of ambiguity in the section, the parol evidence rule bars consideration of the context of negotiation, including any offer or refusal regarding an indemnity agreement. Klabacka v. Nelson, 394 P.3d at 949.  The Court therefore finds that Defendants' reliance in opposition on facts surrounding the negotiation of the Purchase Agreement and the title insurance policy is not only inapposite, but that those facts are barred from consideration as extraneous evidence, given the "clear and unambiguous" terms of section 8.09(b).

Regarding whether the obligation to pay the C-1 Impact Fee remained, Defendants argue that the Impact Fee was unenforceable because of the contract statute of limitations, and therefore does not fall within section 8.09(b).

The statute of limitations for an action upon a contract is six years. NRS 11.190(1)(b). "The defense of limitations, as we all know, is one which it is the privilege of the debtor to make or not, as he pleases. The law does not make it for him, nor does the law pronounce any debt extinguished by virtue, merely, of the lapse of the statutory period. The debt continues the same, and may be collected or reduced to judgment, unless the defense of the statute of limitations be interposed." Blair v. Silver Peak Mines, 84 F. 737 (Circuit Court, D. Nev. 1898).

Defendants argue that the six-year statute of limitations began to run when the payment was owed, in two payments due on May 31, and November 30, 2005. Therefore, after November 29, 2011, the City's cause of action against Commerce for nonpayment was barred.  Plaintiffs note that the Court, in denying Defendant's Motion to Dismiss, already raised the possibility that the obligation might, like a lien, run with the land, or could otherwise exist, or be enforced, outside of the contract action that might bar enforcement in a contract cause of action in a court. Plaintiff notes that it is undisputed that the City of Henderson did in fact seek to enforce the obligation, by requiring payment of the fee prior to issuing Greystone building permits to complete the project.

The underlying agreement between Commerce and the City of Henderson made clear that the C-1 Impact Fee was meant to offset the impact of the development on water draining. See ECF No. 90-10 at 6 (discussing in section 3.1 of the agreement the impact of water drainage from the Tuscany on the Las Vegas Wash and describing the sum of $934,000 as an "appropriate

1  contribution" to offset this effect). Moreover, the agreement conditioned the completion of
2  construction on "the approval of the Phase 3 Plans by the City of Henderson and the payment by
3  Commerce of fees and placement of bonds." Id. at 6. While the amount of the fee may have been
4  determined by the contract between Commerce and the City, the authority to impose and enforce
5  the fee for development did not derive from the contract. Rather, the City has the regulatory
6  authority as a municipality to impose such obligations consistent with the development of land
7  within its jurisdiction. See generally, Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027 (1992)
8  (Recognizing the state's authority to impose regulations with respect to property and commercial
9  dealings). Such authority is not subject to a statute of limitations on a contract claim as it does not
10 arise from a contract but from the traditional regulatory power of the municipality. Id.  Defendants'
11 focus on the statute of limitations related to a contract action is misplaced and irrelevant. The City
12 maintained that an obligation existed associated with the land and had the authority to impose and
13 enforce such an obligation. It was therefore an obligation that Commerce was bound to pay
14 pursuant to section 8.09(b).

15 Defendants also argue that "the evidence shows that the risk of loss associated with
16 nonpayment of the impact fee should be allocated to Greystone or First American. Defendants
17 argue that the evidence regarding the last-day removal of the C-1 Impact Fee exception from the
18 title insurance contract, and the offer and decline for indemnity for the fee, may be considered with
19 reference to section 7.01 of the Purchase Agreement, "Conditions for the Benefit of the Buyer"
20 (cited in section III, *supra*).

21 Defendants assert that the feasibility review implies that where there is evidence of
22 knowledge of and failure to explicitly contract to indemnify an obligation, the Buyer has "assumed
23 the risk," which somehow negates Plaintiff's claim. Conversely, Plaintiff relies on the explicit
24 language of section 8.09(b), which makes clear that any prior-accrued obligation "shall survive
25 Close of Escrow for all purposes." The Court does not find that section 7.01 was intended to
26 supplant any obligation to pay arising under section 8.09(b). Rather, section 7.01 serves as an
27 added opportunity for the Buyer to be able to review all of the documents and details of the
28 agreement and decide to withdraw from the agreement. As such, section 7.01, clearly intended to

provide for a probationary period and a mechanism for the Buyer to withdraw, does not affect the debt or override the clear intention of section 8.09(b) that Seller retains the responsibility for all prior-accrued debts, even after the Close of Escrow. The Court is not persuaded by Defendants' argument in their supplemental brief that such a plain reading of section 8.09(b) "renders nugatory the Initial Feasibility Review and the approval or waiver of title matters provisions found in §6.01 and §7.01." ECF No. 160 at 10. Indeed, the opposite is true; the Defendants' proffered interpretation would render nugatory section 8.09(b). Nor, as discussed *supra*, does the Court find persuasive Defendants' contention that "other payment obligations accruing prior to the Close of Escrow" must be limited to "those items that may be similar in nature to taxes, assessments and bond obligations" merely because the provision is entitled "Property Taxes and Assessments." Id. at 11.

The Court therefore finds that there is no genuine dispute of material fact that Commerce violated section 8.09(b) of the Purchase Agreement by failing to pay the C-1 Impact Fee, which constituted a "payment obligation[] accruing prior to the Close of Escrow," and therefore that summary judgment is warranted on Plaintiff's breach of contract claim. The Court therefore grants Plaintiff's summary judgment motion with respect to its breach of contract claim.

Furthermore, as an action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is express agreement, Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975, 942 P.2d 182, 187 (Nev. 1997), the Court denies the motion without prejudice as to Plaintiff's alternative unjust enrichment claim.

Regarding the amount of damages, while Plaintiff asserted in the original motion that the Collateral Source Rule permitted Plaintiff to recover $934,000, the amount of the C-1 Impact Fee originally owed by Commerce to the City pursuant to the prior agreement (rather than the $300,000 actually paid by Plaintiff to satisfy this obligation), in its supplemental brief, Plaintiff waives this argument and seeks only $300,000, subject to its right to bring a motion for contractual attorneys' fees and related expenses. ECF No. 159 at 6. The Court is not persuaded by Defendants' argument that Plaintiff failed to mitigate damages because the negotiation with the City of Henderson

1  permitted Greystone to either pay a one-time lump sum payment of $300,000, or $341,000 at the
2  rate of $1,000 per residence at closing, effectively passing off the cost to each home buyer. This
3  argument is inapposite, since First American was obligated pursuant to its insurance contract with
4  Greystone to pay the impact fee. That it chose to pay $300,000 instead of $341,000 is evidently
5  fatal to Defendants' contention that Plaintiff did not mitigate its damages.

### B.  Alter Ego Liability

The remaining issue concerns liability for Plaintiff's damages incurred as a consequence of Commerce's breach. Plaintiff seeks summary judgment as to its alter-ego liability claim against Defendants TG Investments, LLC and Gonzalez.

"Nevada has long recognized that although corporations are generally to be treated as separate legal entities, the equitable remedy of 'piercing the corporate veil' may be available to a plaintiff in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual." LFC Marketing Group, Inc. v. Loomis, 8 P.3d 841, 845 (Nev. 2000) (citation omitted). "Indeed, the 'essence' of the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the corporate form are being abused." Id. at 845-46 (citation omitted).

The Supreme Court of Nevada has outlined the contours of alter ego liability:

> The elements for finding an alter ego, which must be established by a preponderance of the evidence are: (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.

Id. at 846-47 (citations and internal quotations omitted).

"Further, the following factors, though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to

observe corporate formalities." Id. at 847 (citations omitted). The Supreme Court of Nevada has "emphasized, however, that [t]here is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." Id. (citations and internal quotations omitted).

Plaintiff argues the undisputed facts as to events occurring after the sale of Tuscany by Commerce to Greystone establish alter ego liability. Defendants do not contest the asserted facts as to the wire transfers but argue that "disbursements to the owners of a business" do not establish alter ego liability. Defendants argue that Gonzalez invested at least $60 million into the project and had a "right" to recoup some of that investment back. Defendants further argue that Gonzalez never had a managerial role in Commerce; and that the managers of Commerce, not Gonzalez, signed the C-1 Channel Phase 3 Agreement.

The Court finds that there is a genuine dispute of material fact as to alter ego liability. These facts show numerous transfers personally benefiting Gonzalez, the sole member of Commerce, in the months following the sale, in spite of a potential debt of which all Defendants would have been aware. However, these facts are not inconsistent with the winding down of a closely held corporation that no longer has a productive purpose. Therefore, the Court will deny summary judgment as to alter ego liability for Gonzalez and TG Investments, LLC and schedule an evidentiary hearing to determine whether they may be held joint and severally liable for Commerce's breach.

. . .

. . .

. . .

## VI. CONCLUSION

**IT IS THEREFORE ORDERED** that summary judgment in favor of Plaintiff on its breach of contract claim is **GRANTED** as discussed in this order. Summary judgment is **DENIED** without prejudice as to Plaintiff's unjust enrichment claim.

**IT IS FURTHER ORDERED** that the Court will hold an evidentiary hearing to determine alter ego liability for Defendants Gonzales and TG Investments, LLC, to be scheduled at the status hearing in this action on July 14, 2020 at 11:00 AM.

DATED: June 8, 2020.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**